IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 114,583

In the Matter of STEPHEN M. STARK,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed June 10, 2016. Two-year suspension suspended, and respondent placed on 2-years' probation.

*Stanton A. Hazlett*, Disciplinary Administrator, argued the cause, and was on the formal complaint for the petitioner.

*David M. Rapp*, of Hinkle Law Firm, L.L.C., of Wichita, argued the cause, and *Stephen M. Stark*, respondent, argued the cause pro se.

*Per Curiam*:  This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Stephen M. Stark, of Wichita, an attorney admitted to the practice of law in Kansas in 1984.

On February 3, 2015, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent filed an answer on March 9, 2015. The parties entered into a written stipulation on April 20, 2015. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on April 21, 2015, where the respondent was personally present and was represented by counsel. The hearing panel determined that respondent violated KRPC 1.3 (2015 Kan. Ct. R. Annot. 461)

1

(diligence); 1.4(a) (2015 Kan. Ct. R. Annot. 482) (communication); and 8.4(d) (2015 Kan. Ct. R. Annot. 672) (engaging in conduct prejudicial to the administration of justice).

Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"*Findings of Fact*

. . . .

"8.      On February 20, 2009, Robert D. Myers, city attorney for the City of Newton, Kansas, negotiated an option to purchase 120 acres of real estate owned by the Claassen family at a price of $7,500.00 per acre, on behalf of the city. The Claassens requested assurance that they would receive at least as favorable a price as other property owners who sold their property to the city. Therefore, the city agreed to include a 'Most Favored Nation' (MFN) clause in the Claassen option agreement. The MFN clause would assure the Claassens would receive the best price per acre paid by the city for other property. The Claassen option expired on August 31, 2010.

"9.      On July 29, 2009, the city purchased a separate tract for the industrial park at $8,000.00 per acre. On January 8, 2010, the city acquired another option to purchase property in connection with the industrial park at a price of $10,000.00 per acre.

"10.      On February 18, 2010, the city exercised its option to purchase the Claassen property, but only offered to pay the Claassens $8,000.00 per acre. The Claassens believed they were entitled to $10,000.00 per acre. The city and the Claassens agreed to close on the purchase of the Claassen property at a price of $8,000.00 per acre. However, the city and the Claassens entered into a Reservation of Rights Agreement under which the Claassens reserved the right to claim a higher price pursuant to the MFN clause. The Reservation of Rights provision contained additional post-closing obligations not set forth above, such as the parties' obligation to negotiate in good faith to attempt to resolve any dispute over the claim for additional compensation.

2

"11.	In December 2010, the Claassens filed a lawsuit against the city claiming $240,000.00 in damages ($2,000.00 per acre for 120 acres).

"12.	The city initially engaged the respondent in 2010, to review the Claassen option contract and provide advice regarding the interpretation of the MFN clause. When the Claassens sued the city over the price of the property, the respondent was retained to handle the litigation on behalf of the city. The respondent was to communicate with the city through Mr. Myers. Mr. Myers would normally have served as co-counsel in the litigation, but it was anticipated that he would be a material witness in the litigation due to his involvement in negotiating the option with the Claassens. Mr. Myers was involved in the strategic planning for the litigation. It was agreed that the appropriate strategy was to move for summary judgment as soon as possible. Alternative arguments would be advanced regarding the MFN clause in the Claassen option:  (1) there was no ambiguity regarding the option terms, so no extrinsic evidence would be necessary to construe it; (2) and, the city's limitations under the Kansas Cash Basis Law and Budget Law rendered the option void.

"13.	From that time until the first part of 2012, the parties were involved in discovery and various other preliminary matters. During that time, the city also retained the respondent to negotiate with Claassens' counsel to get the transaction closed with the Reservation of Rights Agreement. The respondent successfully handled that portion of the representation.

[14.	Not used.]

"15.	On June 5, 2012, Mr. Myers sent the respondent an e-mail asking for a status report regarding the case and asking what needed to be done with respect to the filing of a motion for summary judgment. In July of 2012, the respondent obtained approval from Mr. Myers to have a summer law clerk perform some research on the case.

"16.	On July 11, 2012, the plaintiff's attorney, Lee Thompson, deposed Mr. Myers.

3

"17.     On September 28, 2012, the respondent's firm issued a billing invoice for time worked in July and August of 2012. That billing included an entry by the respondent on August 20, 2012, with the description 'review for scheduling.' No billing memos or invoices were provided to the city after the invoice dated September 28, 2012.

"18.     A scheduling conference was held in September, 2012. The respondent failed to inform Mr. Myers of the scheduling conference held in September, 2012.

"19.     On October 31, 2012, the respondent filed a motion for summary judgment on behalf of the city. The motion asserted that the Claassens' claim was barred by the Cash Basis Law and Budget Law. The memorandum in support of the motion for summary judgment did not present any argument that the MFN clause was unambiguous. The motion also did not address the secondary issues in the lawsuit related to the Claassens' personal property. The respondent failed to discuss the motion with Mr. Myers. Further, the respondent failed to inform Mr. Myers that a motion had been filed. Finally, the respondent failed to provide Mr. Myers with a copy of the motion.

"20.     The Cash Basis Law and Budget Law arguments were based on the theory that the city had not appropriated the money that would have been necessary to pay the higher purchase price demanded by the Claassens. In the motion for summary judgment, the respondent represented that the argument would be supported by an affidavit from Mr. Myers. Specifically, the memorandum in support of the motion referred to an affidavit of Mr. Myers and the affidavit was listed as an exhibit to the memorandum. However, the affidavit was not attached. Although the respondent prepared a draft of an affidavit for Mr. Myers to sign, it was never presented to Mr. Myers for review and execution. While the respondent had not submitted the affidavit to Mr. Myers for review and execution, he believed, based on past communications with Mr. Myers and Mr. Myers' involvement as the city's 30(b)(6) deposition witness, that Mr. Myers had personal knowledge of the facts, law, and concepts set forth in the draft affidavit. The respondent also believed that Mr. Myers would be willing to sign the affidavit as drafted.

4

"21.    On November 28, 2012, Mr. Thompson sent the respondent an e-mail requesting the missing affidavit, noting: 'I would assume that we got it; but could you e-mail or fax me a copy?' Mr. Thompson also requested a 5-day extension of time to respond to the motion for summary judgment. On November 29, 2012, the respondent agreed to the 5-day extension and told Mr. Thompson that the absence of the affidavit was an 'oversight.' On December 4, 2012, Mr. Thompson again e-mailed the respondent asking for a copy of the Myers affidavit. The respondent responded the next day, saying: 'I will check w/Myers, but I'm buried today.'

"22.    On December 7, 2012, Mr. Thompson filed a response to the respondent's motion for summary judgment.

"23.    On December 17, 2012, a hearing was held on the city's motion for summary judgment. The court asked the respondent about the missing affidavit, to which the respondent replied:

> 'I've not obtained exhibit 9, the Myers' [sic] affidavit, yet. Since counsel's
> brief indicated that whatever the facts attested to by Mr. Myers—
> prepared to argue around those, I went ahead and proceeded forward, but
> I'll shore that up and provide that.'

Later in that hearing, the court again raised the issue of the affidavit and it said:

> 'It sounds like this isn't a big deal, the affidavit from Mr. Myers, exhibit
> 9, but just out of an abundance of caution, Mr. Stark, why don't you, if
> you could—and I'm assuming you can. If you could, get that in our court
> file and then also to Mr. Thompson, say before the end of the day
> tomorrow. I am assuming it's in your materials.'

As part of this discussion about the affidavit, Mr. Thompson raised a concern about obtaining some assurance that the affidavit actually existed at the time of hearing:

'I'm just a little bothered. I, of course, want counsel to represent to the Court or show that that was done prior to today's argument. I mean—and I'm not questioning Mr. Stark. He and I know each other, but I haven't seen it or anything else, and I think to protect my client, we need that representation that it was available and was part of what should have been submitted.'

The court acknowledged Mr. Thompson's concern, saying, 'Mr. Stark if you could let us know along the lines of what Mr. Thompson suggests, what the availability was of that exhibit.' The respondent did not respond on the record regarding the status of the affidavit. No further discussion was had regarding the affidavit at the hearing.

"24.    The respondent failed to communicate with Mr. Myers from July, 2012, until December 19, 2012, when the respondent phoned Mr. Myers. Mr. Myers was unavailable, but responded by an e-mail inviting the respondent to provide him information regarding the law clerk's research and inquiring about the summary judgment motion. The respondent did not reply to Mr. Myers' December 19, 2012, e-mail. He did attempt to reach Mr. Myers by phone on two occasions, but Mr. Myers was out of the office at those times.

"25.    On December 20, 2012, Mr. Thompson filed a supplemental memorandum in opposition to the respondent's motion for summary judgment. The respondent failed to provide Mr. Myers with a copy of the supplemental memorandum in opposition to the respondent's motion for summary judgment.

"26.    The court held a pretrial conference on January 4, 2013. On January 11, 2013, a pretrial conference order was entered setting the case for a 3-day jury trial beginning February 20, 2013. The respondent failed to inform Mr. Myers that a pretrial conference had been held, that a pretrial order had been entered, or that the court scheduled the case for jury trial beginning February 20, 2013.

6

"27.    On January 14, 2013, Judge Joe Dickinson sent the parties a letter denying the city's motion for summary judgment. Regarding the affidavit, Judge Dickinson wrote:

'At the hearing it was brought to my attention that exhibit 9 was never filed by the defense, although it was referenced in the Memorandum in Support of the Motion for Summary Judgment (see page 6). I checked again today and the Court has never received exhibit 9, apparently an Affidavit of Robert Myers. I've seen, as did claimant's counsel, that this was inadvertent and would be supplied by the defendant, and accordingly, I allowed additional time to supply the document. In any event, setting that issue aside, I find that the city's motion for summary judgment should be denied . . . .'

The respondent did not advise Judge Dickinson that the affidavit had never been signed. The respondent failed to inform Mr. Myers that the court sent the parties a letter denying the city's motion for summary judgment. The respondent failed to provide a copy of Judge Dickinson's letter to Mr. Myers.

"28.    In the journal entry and order denying motion for summary judgment, the court noted the following regarding the affidavit:

'The factual basis for the city's argument was set out in paragraphs 27 through 33 of its Memorandum, citing the Affidavit of Robert Myers, City Attorney for Newton. However, the reference to the affidavit was not attached to the Memorandum. Even though the issue was raised in Plaintiffs' response at oral argument and by way of a Supplemental Memorandum, no affidavit was filed of record.'

The respondent failed to provide Mr. Myers with a copy of the journal entry and the order denying motion for summary judgment.

7

"29.     Through January and early February of 2013, the respondent and Mr. Thompson exchanged various communications regarding possible mediators for the case. On February 13, 2013, they agreed the trial date should be rescheduled to May 8, 2013, and May 9, 2013, to allow additional time for mediation. From February 21, 2013, through April 5, 2013, Mr. Thompson contacted the respondent at least six times to address potential mediators and waiver of a jury trial. The respondent did not respond to Mr. Thompson. On March 13, 2013, a legal secretary from the respondent's firm, Linda Hansen, sent an e-mail to the respondent stating:

'Lee Thompson is getting desperate. He left a voicemail message for me saying he had been trying to contact you by e-mail and phone to schedule mediation and wondered if I could help him. Will you call him?'

"30.     On April 5, 2013, Mr. Thompson sent a letter to the respondent stating the following:

'I have written, called and e-mailed on numerous occasions trying to get your input on acceptable dates to conduct a mediation in the captioned case. I agreed to your suggestion of Mert Buckley as a mediator and identified numerous dates I would be available. . . .

'Given the absence of a response to possible mediation, my clients have reviewed the case with me and a [sic] willing to make an offer of settlement at this time. . . .'

Mr. Thompson's April 5, 2013, letter further outlines a settlement proposal in which the Claassens would accept a lower cash amount ($200,000.00) in exchange for favorable leasing terms related to other farmland owned by the city. The respondent failed to communicate the settlement offer to Mr. Myers.

"31.     In early May 2013, Mr. Myers was contacted by telephone by the respondent and three other attorneys in his firm. At that time, the respondent, for the first time, informed Mr. Myers that the case was scheduled for trial on May 8, 2013, and May

8

9, 2013. The respondent and the other attorney also informed Mr. Myers of other matters that had already transpired without his knowledge, including: entry of a scheduling order; filing of a motion for summary judgment; argument upon the motion of summary judgment; ruling (against the city) on the motion for summary judgment; and entry of a pretrial order closing discovery and identifying the issues and witnesses in the case.

"32.     Thereafter, Mr. Myers retained other counsel to represent the city in the pending litigation. Following the engagement of substitute counsel for the city, a motion was filed supported by an affidavit from the respondent to re-open the pretrial proceeding and continue the trial.

"33.     As a result of the respondent's conduct, the trial was continued from May 2013, to August 2013, the court amended the pretrial conference order, and the court re-opened discovery.

"34.     On May 2, 2013, the respondent self-reported his misconduct to the disciplinary administrator. On May 10, 2013, Mr. Myers filed a complaint against the respondent for the same conduct.

"*Conclusions of Law*

"35.     Based upon the respondent's stipulation and the above findings of fact, the hearing panel concludes as a matter of law that the respondent violated KRPC 1.3, KRPC 1.4, and KRPC 8.4(d) as detailed below.

"KRPC 1.3

"36.     Attorneys must act with reasonable diligence and promptness in representing their clients. *See* KRPC 1.3. The respondent failed to diligently and promptly represent the City of Newton, Kansas. Because the respondent failed to act with reasonable diligence and promptness in representing his client, the hearing panel concludes that the respondent violated KRPC 1.3.

9

## "KRPC 1.4

"37.     KRPC 1.4(a) provides that '[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.' In this case, the respondent violated KRPC 1.4(a) when he failed to inform Mr. Myers of the many events occurring in the litigation. Accordingly, the hearing panel concludes that the respondent violated KRPC 1.4(a).

## "KRPC 8.4(d)

"38.     'It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' KRPC 8.4(d). The respondent stipulated that he engaged in conduct that was prejudicial to the administration of justice by:

    a.     failing to present the affidavit to Mr. Myers for consideration and signature;

    b.     making reference in the memorandum to an affidavit that had not been reviewed or signed by Mr. Myers;

    c.     filing a motion for summary judgment and memorandum without attaching a signed affidavit; and

    d.     failing to advise opposing counsel or the court that the affidavit had not been presented to Mr. Myers for consideration or signature.

The respondent's conduct was prejudicial to the administration of justice. As such, the hearing panel concludes that the respondent violated KRPC 8.4(d).

10

"39.     In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"40.     *Duty Violated*. The respondent violated his duty to his client to provide diligent representation and adequate communication. The respondent violated his duty to the legal profession to refrain from conduct which is prejudicial to the administration of justice.

"41.     *Mental State*. The respondent negligently and knowingly violated his duties.

"42.     *Injury*. As a result of the respondent's misconduct, the respondent caused potential injury to his client, the City of Newton, Kansas.

"43.     *Aggravating and Mitigating Factors.* Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

a.     Prior Disciplinary Offenses. The respondent has been previously disciplined on one occasion. On February 20, 2003, the respondent entered into a diversion agreement. In the diversion agreement, the respondent stipulated that he violated KRPC 1.3 and KRPC 1.4.

b.      A Pattern of Misconduct. The respondent engaged in a pattern of misconduct by neglecting this matter for an extended period of time and by repeatedly failing to inform Mr. Myers regarding the status of the litigation.

c.      Multiple Offenses. The respondent committed multiple rule violations. The respondent violated KRPC 1.3, KRPC 1.4, and KRPC 8.4(d). Accordingly, the hearing panel concludes that the respondent committed multiple offenses.

d.      Substantial Experience in the Practice of Law. The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 1984. At the time of the misconduct, the respondent has been practicing law for more than 25 years.

"44.      Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

a.      Personal or Emotional Problems if Such Misfortunes Have Contributed to Violation of the Kansas Rules of Professional Conduct. The respondent has suffered from chronic depression and anxiety throughout the majority of his adult life. He has sought treatment for this condition and is currently working with a treatment professional to control his depression. It is clear that the respondent's depression contributed to the misconduct.

b.      The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions. The respondent fully cooperated with the disciplinary process. Additionally, the respondent admitted the facts that gave rise to the violations. Finally, the respondent stipulated that he violated KRPC 1.3, KRPC 1.4, and KRPC 8.4(d). The respondent's cooperation is a significant mitigating factor.

c.      Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General

12

Reputation of the Attorney. The respondent is an active and productive member of the bar of Wichita, Kansas. The respondent also enjoys the respect of his peers and generally possesses a good character and reputation as evidenced by several letters received by the hearing panel.

d.      Remorse. At the hearing on this matter, the respondent expressed genuine remorse for having engaged in the misconduct.

e.      Remoteness of Prior Offenses. The respondent's participation in the attorney diversion program in 2003 is remote in time but not in character to the misconduct in this case.

"45.    In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'4.42    Suspension is generally appropriate when:

(a)      a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client; or

(b)      a lawyer engages in a pattern of neglect and causes injury or potential injury to a client.'

"*Recommendation*

"46.    The disciplinary administrator recommended that the respondent be suspended from the practice of law for a period of 2 years. The disciplinary administrator further recommended that the imposition of the suspension be suspended and that the respondent be placed on probation subject to the terms and conditions detailed in the respondent's proposed probation plan. Finally, the disciplinary administrator recommended that the respondent continue in treatment, that the respondent execute

13

appropriate releases, and that the treatment provider provide quarterly written reports regarding the respondent's progress in treatment.

"47.     The respondent recommended that he be suspended for a period of 90 days and that he be granted probation from that suspension subject to the terms and conditions detailed in his proposed probation plan.

"48.     In order for the hearing panel to consider recommending that the respondent be placed on probation, the respondent must first comply with Kan. Sup. Ct. R. 211(g)(1) and Kan. Sup. Ct. R. 211(g)(2). Additionally, the hearing panel must then consider, based upon the factors detailed in Kan. Sup. Ct. R. 211(g)(3), whether to recommend to the Court that the respondent be placed on probation.

'(g)     Requirements of Probation

(1)     If the Respondent intends to request that the Respondent be placed on probation for violating the Kansas Rules of Professional Conduct or the Kansas Supreme Court Rules, the Respondent shall provide each member of the Hearing Panel and the Disciplinary Administrator with a workable, substantial, and detailed plan of probation at least fourteen days prior to the hearing on the Formal Complaint. The plan of probation must contain adequate safeguards that will protect the public and ensure the Respondent's full compliance with the disciplinary rules and orders of the Supreme Court.

(2)     If the Respondent provides each member of the Hearing Panel and the Disciplinary Administrator with a plan of probation, the Respondent shall immediately and prior to the hearing on the Formal Complaint put the plan of probation into effect by complying with each of the terms and conditions of the probation plan.

(3)     The Hearing Panel shall not recommend that the Respondent be placed on probation unless:

14

(i) the Respondent develops a workable, substantial, and detailed plan of probation and provides a copy of the proposed plan of probation to the Disciplinary Administrator and each member of the Hearing Panel at least fourteen days prior to the hearing on the Formal Complaint;

(ii) the Respondent puts the proposed plan of probation into effect prior to the hearing on the Formal Complaint by complying with each of the terms and conditions of the probation plan;

(iii) the misconduct can be corrected by probation; and

(iv) placing the Respondent on probation is in the best interests of the legal profession and the citizens of the State of Kansas.'

Kan. Sup. Ct. R. 211(g). The respondent provided each member of the hearing panel and the disciplinary administrator with a workable, substantial, and detailed plan of probation at least fourteen days prior to the hearing on the formal complaint. The respondent's plan contains adequate safeguards that will protect the public and ensure the Respondent's full compliance with the disciplinary rules and orders of the Supreme Court. The respondent put the plan of probation into effect by complying with each of the terms and conditions of the probation plan. The respondent's misconduct can be corrected by probation. Finally, placing the respondent on probation is in the best interests of the legal profession and the citizens of the State of Kansas.

"49. The hearing panel has carefully considered the facts of this case. The respondent's depression is profound and the mitigation factors are significant. As a result

15

of the persuasive factors in mitigation, the hearing panel unanimously recommends that the respondent be suspended for a period of 2 years. The hearing panel further recommends that the respondent be granted probation, subject to the following terms and conditions:

a.  *Term of Probation*. The respondent will remain on probation for a period of 2 years.

b.  *Practice Supervision*. Charles E. Cole, Jr. will serve as the respondent's practice supervisor. The respondent will allow the practice supervisor full and complete access to his files, calendar, and trust account records. The respondent will comply with all requests made by the practice supervisor. The respondent will meet with the practice supervisor on a monthly basis throughout the period of probation. The practice supervisor will provide a report to the respondent and the disciplinary administrator's office every quarter throughout the period of probation, detailing the respondent's compliance with each term and condition of probation. The practice supervisor will be acting as an officer and agent of the Kansas Supreme Court while supervising the respondent on probation. The practice supervisor will be afforded all immunities granted by Kan. Sup. Ct. R. 223 during the course of his supervising activities.

c.  *Inventory*. Within 30 days of the date of this report, the respondent will provide the practice supervisor with an inventory of cases and clients. The inventory will include all deadlines and scheduled activity. Each month, the respondent will provide the practice supervisor with an updated inventory.

d.  *Limitation on Practice.* The respondent will not accept any new clients or new matters for existing clients unless an additional member of his law firm is added as the responsible party for the new matter. The respondent agrees to engage the assistance of an additional member of his law firm on all currently existing and newly initiated litigation matters. The respondent will not serve as first-chair on any litigation matters.

e.  *Communication*. The respondent will review every open file to determine whether he has adequately communicated with each client. For every case where no

16

activity has taken place for 30 days or more, the respondent will make written contact with the client providing a status report.

f.      *Billing*. The respondent will ensure that monthly billing statements are sent to each client unless a written agreement with the client provides otherwise.

g.      *Audits*. Within 30 days of the date of this report, the practice supervisor will conduct an initial audit of the respondent's files. Thereafter, every 6 months, the practice supervisor will conduct additional audits. At the conclusion of probation, the practice supervisor will conduct a final audit. If the practice supervisor discovers any violations of the Kansas Rules of Professional Conduct, the practice supervisor will include such information in his report. The practice supervisor will provide the disciplinary administrator and the respondent with a copy of each audit report. The respondent will follow all recommendations and correct all deficiencies noted in the practice supervisor's periodic audit reports.

h.      *Psychological Treatment*. The respondent will continue his treatment for depression and anxiety throughout the period of supervised probation, unless the treatment provider determines that continued treatment is no longer necessary. The treatment provider will notify the practice supervisor and the disciplinary administrator in the event that the respondent discontinues treatment against the recommendation of the treatment provider during the probationary period. The respondent will provide the treatment provider with appropriate releases of information to allow the treatment provider to provide such information to the practice supervisor and the disciplinary administrator.

i.      *Continued Cooperation*. The respondent will continue to cooperate with the disciplinary administrator. If the disciplinary administrator requests any additional information, the respondent will timely provide such information.

j.      *Additional Violations*. The respondent will not violate the terms of his probation or the provisions of the Kansas Rules of Professional Conduct. In the event that the respondent violates any of the terms of probation or any of the provisions of the

17

Kansas Rules of Professional Conduct at any time during the probationary period, the respondent will immediately report such violation to the practice supervisor and the disciplinary administrator. The disciplinary administrator will take immediate action pursuant to Kan. Sup. Ct. R. 211(g).

"50.     Costs are assessed against the respondent in an amount to be certified by the office of the disciplinary administrator."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2015 Kan. Ct. R. Annot. 350). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

Respondent was given adequate notice of the formal complaint, to which he filed an answer, and adequate notice of the hearing before the panel and the hearing before this court. The respondent did not file exceptions to the hearing panel's final hearing report. As such, the findings of fact are deemed admitted. Supreme Court Rule 212(c) and (d) (2015 Kan. Ct. R. Annot. 369).

The evidence before the hearing panel establishes by clear and convincing evidence the charged misconduct violated KRPC 1.3 (2015 Kan. Ct. R. Annot. 461) (diligence); 1.4(a) (2015 Kan. Ct. R. Annot. 482) (communication); and 8.4(d) (2015

18

Kan. Ct. R. Annot. 672) (engaging in conduct prejudicial to the administration of justice), and it supports the panel's conclusions of law. We adopt the panel's conclusions.

The only remaining issue before us is the appropriate discipline for respondent's violations. As noted, the panel recommended a 2-year suspension from the practice of law in the state of Kansas but that the suspension be stayed to allow respondent to be placed on probation under the terms and conditions set forth in its final hearing report. At oral arguments before this court, the Disciplinary Administrator recommended the panel's proposed sanction of a 2-year suspension, stayed to allow respondent to be placed on a 2-year probation upon the panel's proposed terms and conditions, but with the added condition that respondent make a reasonable effort to pay restitution for the additional legal fees his misconduct cost his aggrieved client. Respondent's counsel argued for a shorter term for the underlying suspension but agreed to the 2-year probation.

We are not bound by the recommendations of either the Disciplinary Administrator or the hearing panel. See *In re Mintz*, 298 Kan. 897, 911-12, 317 P.3d 756 (2014). We fashion a disciplinary sanction in each case presented to us based upon its particular facts and circumstances, including the aggravating and mitigating circumstances of the violations. 298 Kan. at 912. In this case, however, a majority of the court finds the sanction recommended by the Disciplinary Administrator at the hearing before this court to be appropriate; a minority of the court would impose a shorter term for the underlying suspension.

Specifically, we hold that the respondent is suspended from the practice of law in the state of Kansas for a period of 2 years but that suspension is stayed and the respondent is placed on probation for a period of 2 years from and after the filing of this opinion, on the terms and conditions set forth in the hearing panel's final hearing report, as outlined above, with the additional condition that respondent make a reasonable effort

19

to pay restitution for the additional legal fees his misconduct cost his aggrieved client. The termination of probation, whether probation was successful or not, shall be governed by the provisions of Supreme Court Rule 211(g) (2015 Kan. Ct. R. Annot. 350). A minority of the court would impose a different condition of probation regarding a more certain restitution to the aggrieved client.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Stephen M. Stark be and is hereby suspended from the practice of law in the state of Kansas, in accordance with Supreme Court Rule 203(a)(2) and (5) (2015 Kan. Ct. R. Annot. 293), for a 2-year period, but imposition of that discipline shall be stayed and respondent placed on probation for a 2-year period from the date this opinion is filed, upon the terms and conditions outlined above.

IT IS FURTHER ORDERED that the termination of respondent's probation, whether probation was successful or not, shall be effected pursuant to Supreme Court Rule 211(g).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.

BEIER, J., not participating.